**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

TOWER AUTOMOTIVE, LLC, and )
TOWER AUTOMOTIVE, INC., )
    Plaintiffs, )
 )
vs. )
 )
LUMBERMENS MUTUAL CASUALTY ) Case No.  FILED: APRIL 17,2008
COMPANY, )       08CV 2218  NF
    Defendant. )       JUDGE KENDALL
 )       MAGISTRATE JUDGE KEYS
 )
 )
 )

**COMPLAINT**

Tower Automotive, LLC and Tower Automotive, Inc. ("Tower"), by and through their

attorneys Kirkland & Ellis, LLP, for their Complaint against Lumbermens Mutual Casualty

Company ("Lumbermens"), allege as follows:

**NATURE OF THE CASE**

1.  Tower brings this action for breach of a Settlement Agreement and Release

("Settlement Agreement") and Stipulation Regarding Letter of Credit Requirements Under

Certain Insurance Policies ("Stipulation") entered into on May 9, 2007 between Tower and

Lumbermens which settled an Adversary Proceeding ("Previous Litigation") filed by Tower in

the Bankruptcy Court for the Southern District of New York under Adv. Proc. No. 06-01481.

(*See* Settlement Agreement, attached hereto as Ex. A; Stipulation, attached hereto as Ex. B.)

2.  The Settlement Agreement and accompanying Stipulation were approved by the

Bankruptcy Court on June 5, 2007.  (*See* Order approving Settlement Agreement, attached hereto

as Ex. C.)

3.    The underlying Lawsuit involved a dispute over Tower's and Lumbermens' respective rights to collateral in the form of letters of credit issued by Tower to secure its claim and other loss payment obligations under workers compensation, general liability and automotive liability policies issued by Lumbermens between April 1997 and April 2003.

4.    As part of the Settlement Agreement, the parties agreed, among other agreements, that Lumbermens would conduct annual reviews of collateral, beginning in November 2007, to determine the adequacy of collateral and, if warranted, adjust the collateral.  These adjustments, per the Settlement Agreement, are to be based on "Lumbermens' usual and customary methodology" which "shall involve the use of loss development factors specified in the Policies and, if and when such contractual factors are not specified, shall incorporate Lumbermens' actuarially-derived loss development factors and credit margins applicable to its insurance business generally."  (Ex. A, Settlement Agreement ¶ 7.)

5.    Despite its obligations under the Settlement Agreement, and the respective rights of Tower under the Settlement Agreement, Lumbermens arbitrarily imposed a 35% credit surcharge on Tower as part of the November 2007 annual collateral review.

6.    Lumbermens has refused to provide any "actuarially-derived loss development factors [or] credit margins" on which this surcharge is based and has generally refused Tower's request for documentation supporting the imposition of this surcharge.

7.    Tower seeks a declaratory judgment:  1) that Lumbermens has breached the Settlement Agreement by imposing the 35% surcharge; 2) that Lumbermens is not entitled to the 35% surcharge under the terms of the Settlement Agreement; and, 3) that Tower is not required to pay a 35% surcharge under the Settlement Agreement.

## JURISDICTION AND VENUE

8.      This court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 as there is diversity among the parties, and the amount in controversy, exclusive of interests and costs, exceeds $75,000.

9.      Venue is appropriate in this district pursuant to 28 U.S.C. § 1391 because the defendant resides in this judicial district, and because a substantial part of the events giving rise to the claim occurred in this judicial district.

10.     This court is vested with power to render a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, which permit this Court to declare the rights, duties and other legal relations of a party and to declare and order further relief as appropriate.

## THE PARTIES

11.     Both Tower Automotive, LLC and Tower Automotive, Inc. are corporations organized and existing under the laws of the State of Delaware with their principal place of business in the State of Michigan.  Tower is a leading global designer and manufacturer of a broad range of structural components, assemblies and modules, many of which are critical to the structural integrity of their customers' automobiles.  Tower also has a significant Illinois presence.  It currently operates a Chicago, Illinois plant, employing over 450 employees, and formerly operated a Granite City, Illinois plant up until 2006.

12.     Tower Automotive, Inc. filed for bankruptcy on Feburary 2, 2005.  As part of the reemergence process, Tower Automotive, LLC was formed and acquired a substantial portion of Tower Automotive, Inc.'s assets, including its rights with regard to the litigation against Lumbermens and the resulting Settlement Agreement.

13.     Lumbermens Mutual Casualty Company is organized and exists under the laws of the State of Illinois with its principal place of business in the State of Illinois.  In its prior

3

operational capacity, Defendant offered a wide array of personal, risk management, and

commercial property/casualty products.  However, Defendant is no longer writing policies and is

currently voluntarily liquidating by running off its remaining property/casualty business.

**SETTLEMENT AGREEMENT, STIPULATION AND PRESENT DISPUTE**

14.     Paragraph 7 of the Settlement Agreement governs Lumbermens' obligations to

reduce Tower's collateral to reflect Tower's payment of losses and the resolution of the

remaining open claims in Tower's mature book of claims.  Paragraph 7 provides in relevant part

that Lumbermens must re-determine the amount of the required remaining collateral annually,

and must base those collateral determinations on "actuarially-derived loss development factors

and credit margins applicable to its insurance business generally":

> On or about November 1, 2007, and at annual intervals thereafter, Lumbermens
> shall perform a review, pursuant to the Policies and incorporating Lumbermens'
> usual and customary methodology, to determine the adequacy of the Collateral at
> such time and shall, when warranted, promptly cause an adjustment of the
> Collateral.  For the avoidance of doubt, Lumbermens' usual and customary
> methodology shall involve the use of loss development factors specified in the
> Policies and, if and when such contractual factors are not specified, shall
> incorporate Lumbermens' actuarially-derived loss development factors and credit
> margins applicable to its insurance business generally.  These annual adjustments
> shall be further subject to the Stipulation referred to in Paragraph 8 below.

(Ex. A, Settlement Agreement ¶ 7.)

15.     Paragraph 3 of the Stipulation (to which the last sentence of the above-quoted

provision refers) states:

> On or about November 1, 2007, and at annual intervals thereafter (each an
> "Annual Redetermination"), Lumbermens shall perform a review, pursuant to the
> Policies and incorporating Lumbermens' usual and customary methodology, to
> determine the adequacy of the Collateral at such time and shall, when warranted,
> promptly cause and/or authorize an adjustment to the Collateral subject to the
> terms of this Stipulation.  For the avoidance of doubt, Lumbermens' usual and
> customary methodology shall involve the use of loss development factors
> specified in the Policies and, if and when such contractual factors are not

specified, shall incorporate Lumbermens' actuarially-derived loss development factors and credit margins applicable to its insurance business generally.

(Ex. B, Stipulation ¶ 3.)

16.    Thus, under both the Settlement Agreement and Stipulation, Lumbermens is required, in making its annual collateral redeterminations, to use its "usual and customary methodology" which "shall involve the use of loss development factors specified in the Policies," or "incorporate Lumbermens' actuarially-derived loss developments factors and credit margins applicable to its insurance business generally."

17.    As part of the November 1, 2007 annual collateral re-determination, Lumbermens sought to impose a 35% credit surcharge on Tower.

18.    Tower's book of claims to which the surcharge was applied is mature (the most recent policy expired in April 2003) with stable, well-established claims reserves.

19.    Upon information and belief, the credit surcharge is unprecedented in the industry and cannot be supported by the methodology required in the Settlement Agreement, which requires that the surcharge or credit margins imposed be "actuarially-derived" and fairly applied to all of Lumbermens' policy holders.

20.    On January, 22, 2008, James Commet of Tower sent an email to Lumbermens' representative, Jack McGregor of Kemper Insurance Companies, protesting the imposition of a 35% credit surcharge and requesting specific documentation supporting imposition of the credit surcharge, how it was "actuarially-derived," and how it applied to Lumbermens' insurance business generally. (*See* 1/22/08 email, attached hereto as Ex. D.)

21.    On February 11, 2008, James McGregor replied to Mr. Commet's email by describing the collateral calculation generally and providing the following non-responsive explanation of the 35% credit surcharge:

[W]e add a margin ranging from 15% to 75% -- to account for the fact that half the time our calculations will be deficient and half the time they will be conservative, and to make sure that we're erring on the side of eliminating the deficiencies.

The varying margins are the product of both the policyholder's financial /credit risk and the seasoning of the losses, such that an older account with A rated credit will receive a 15% margin and a more recent account in Chapter 11 will get a 75% margin. Most accounts written primarily in the last seven to ten years fall within the 25% to 35% margin range, depending largely on the insured's financials.

Tower's 35% is what we would have assigned any similarly-situated policyholder, and it will decrease with the passages of time.

(*See* 2/11/2008 email, attached hereto as Ex. E.)

22.     On February 14, 2008, counsel for Tower followed up with a letter to Jack McGregor informing him that his response was insufficient to support the imposition of a 35% surcharge under the Settlement Agreement. (*See* 2/14/08 letter, attached hereto as Ex. F.) The letter requested a detailed response as to how the credit margin was actuarially-derived and how it applied to Lumbermens business generally as required in the Settlement Agreement. It also again requested the specific documents supporting Lumbermens' imposition of the surcharge using the factors identified in the Settlement Agreement. (*Id.*)

23.     Lumbermens has failed to respond to repeated requests for information, including documents, to support its imposition of the 35% surcharge pursuant to the factors identified in the Settlement Agreement.

24.     Lumbermens' imposition of the 35% credit surcharge is not: 1) supported by the use of loss development factors specified in the Policies, or 2) by Lumbermens' actuarially-derived loss development factors or credit margins applicable to its insurance business generally.

25.    Lumbermens' imposition of the 35% credit surcharge does not reflect or incorporate loss development factors and credit margins which are "actuarially-derived" as required in the Settlement Agreement.

26.    Upon information and belief, Lumbermens' imposition of the 35% credit surcharge does not reflect or incorporate loss development factors and credit margins which are "applicable to [Lumbermens'] insurance business generally" as required by the Settlement Agreement.

27.    Lumbermens has no good-faith basis to impose a 35% credit surcharge on Tower as part of a collateral re-determination.

## COUNT I - BREACH OF CONTRACT (Settlement Agreement)

28.    Tower incorporates the allegations in all preceding paragraphs as though the same were repeated herein.

29.    Lumbermens has breached the Settlement Agreement and Stipulation by imposing an unsupported and unjustified 35% credit surcharge on Tower as part of its annual collateral determination.

30.    Under the terms of the Settlement Agreement and Stipulation, Tower is not responsible or liable to Lumbermens for this 35% credit surcharge relating to the collateral re-determination.

31.    Lumbermens refuses to provide Tower with documentation or information supporting the imposition of the 35% surcharge, specifically how it was determined using Lumbermens' "actuarially-derived loss development factors and credit margins applicable to its insurance business generally."

WHEREFORE, Plaintiff requests that the Court order that:

A.    Lumbermens modify its November 2007 annual collateral re-determination to eliminate the 35% credit surcharge and release that collateral to Tower;

B.    Lumbermens pay Tower its lost interest and other expenses incurred as a result of Lumbermens wrongful imposition of the 35% credit surcharge;

C.    Lumbermens be enjoined from imposing any credit surcharge in the future;

D.    Lumbermens pay Tower's attorneys' fees and costs in bringing this action;

E.    Lumbermens comply with any additional terms of relief that this Court deems just and appropriate.

## COUNT II - DECLARATORY RELIEF (Alternative Relief)

32.    Tower incorporates the allegations in all preceding paragraphs as though the same were repeated herein.

33.    This court is vested with power to render a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, which permits this Court to declare the rights, duties and other legal relations of a party and to declare and order further relief as appropriate.

WHEREFORE, Plaintiff respectfully requests that the Court issue an order declaring that:

A.    Lumbermens has breached the Settlement Agreement by charging Tower a 35% surcharge as part of its annual collateral re-determination;

B.    Lumbermens must provide an actuarial accounting of its imposition of the 35% surcharge imposed on Tower as part of its November 2007 annual collateral re-determination, including, without limitation, an accounting of how the surcharge was determined using its "actuarially-derived loss development factors and credit margins," how the surcharge applies to its "insurance business generally," and any and all documentation supporting imposition of the surcharge;

C.     Lumbermens must provide an actuarial accounting of any future surcharge imposed upon Tower as part of any future annual collateral re-determination, including, without limitation, an accounting of how the surcharge was determined using "actuarially-derived loss development factors and credit margins," how the surcharge applies to its "insurance business generally," and any and all documentation supporting its imposition of a surcharge;

D.     Lumbermens must pay Tower's costs and attorneys' fees for bringing this action; and

E.     Tower is entitled to any and all additional relief as the Court deems just and proper.

### JURY DEMAND

Plaintiffs hereby demand a jury trial.


Dated: April 17, 2008                    Respectfully submitted,

                                         **KIRKLAND & ELLIS LLP**
                                         /s/ Amy C. Haywood
                                         Andrew R. Running
                                         Ryan Blaine Bennett
                                         Amy C. Haywood
                                         200 East Randolph Drive
                                         Chicago, Illinois 60601
                                         Telephone:  (312) 861-2000

                                         Attorneys for Plaintiff
                                         *Tower Automotive, L.L.C.*

# EXHIBIT A

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release ("Agreement") is made and entered into this ____9____ day of May, 2007 by and between Lumbermens Mutual Casualty Company and its insurance company subsidiaries and affiliates (collectively "Lumbermens") and Tower Automotive, Inc. and its subsidiaries and affiliates (collectively "Tower").

WHEREAS, commencing in 1997, Lumbermens and Tower entered into various written proposals for and contracts of insurance (collectively the "Policies") pursuant to which Lumbermens purported to provide workers compensation, general liability and automobile liability insurance protection and insurance-related services to Tower; and

WHEREAS, Tower assumed various financial obligations to Lumbermens in connection with the Policies (collectively the "Tower Payment Obligations"); and

WHEREAS, specifically, Tower is obligated under the Policies to reimburse or otherwise fund a certain portion of each claim or loss (including indemnity and allocated expense) to which the Policies respond, some of which losses are characterized as "deductible" losses and some of which are characterized as "insured" losses subject to a dividend plan (collectively the "Tower Retained Losses"); and

WHEREAS, in connection with the Policies, Tower procured from Deutsche Bank, and had Lumbermens identified as the beneficiary on, an unconditional evergreen letter of credit (the "Collateral") securing the Tower Payment Obligations, including the Tower Retained Losses; and

WHEREAS, a dispute has arisen between Lumbermens and Tower concerning the Tower Payment Obligations, including but not limited to Tower's alleged obligation to

pay Lumbermens certain amounts Lumbermens billed to Tower under invoices numbered DC70510 (the "2004 Invoice") and DC87843 (the "2006 Invoice");  and

WHEREAS, Lumbermens previously drew on the Collateral to secure payment from Deutsche Bank of the 2004 Invoice (the "Collateral Draw") but the 2006 Invoice remains unpaid;  and

WHEREAS, on February 2, 2005, Tower filed in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code;  and

WHEREAS, Lumbermens contends, and Tower disputes, that Tower owes payment on the 2006 Invoice and that certain Tower Payment Obligations, not limited to Tower's obligation to pay the Tower Retained Losses, exist today and will continue to exist and become due and payable in the future;  and

WHEREAS, in connection with the above dispute, Tower filed an adversary proceeding against Lumbermens in the Bankruptcy Court under Cause No. 06-01481 (the "Lawsuit"), which Lawsuit is presently in abeyance pending the resolution of an arbitration of the matters alleged therein;  and

WHEREAS, Lumbermens and Tower each have determined that it is in each of their best interests to resolve their disagreements and disputes, including the Lawsuit and the matter of the Tower Payment Obligations other than the Tower Retained Losses, by way of this Agreement.

NOW THEREFORE, in consideration of the covenants and agreements contained herein, Lumbermens and Tower agree as follows:

2

1.      **Accord and Satisfaction.**

Except as set forth in Paragraph 2 below, the net sum of all monies previously

paid to Lumbermens by Tower and Deutsche Bank, specifically including the proceeds of

the Collateral Draw, constitutes a full and final negotiated accord and satisfaction of all

of the Tower Payment Obligations whether presently existing or arising in the future.

For the avoidance of doubt, and except as set forth in Paragraph 2 below, (a)

Lumbermens shall retain for its own account the proceeds of the Collateral Draw and all

other amounts heretofore paid to Lumbermens by Tower, (b) Tower shall have no

obligation to Lumbermens under the 2006 Invoice or for any Tower Payment Obligation

whatsoever, and (c) neither Lumbermens nor Tower shall invoice, account to, or have any

financial obligations to the other under any circumstances whatsoever.

2.      **Tower's Continuing Payment of Retained Losses.**

Beginning on the date of execution hereof, Lumbermens shall commence

invoicing Tower on a monthly basis for reimbursement of all Tower Retained Losses

actually paid by Kemper during the previous monthly period.  Notwithstanding any

provisions of this Agreement, Tower expressly acknowledges its continuing obligation

under the Policies to pay or reimburse Lumbermens for the Tower Retained Losses.

Lumbermens' monthly invoices shall contain sufficient claim detail to allow

Tower to identify, verify and authenticate Lumbermens' actual payment of the Tower

Retained Losses.  Tower shall pay such invoices within thirty days of receipt thereof, and

any unpaid invoices not challenged or disputed in good faith within such period shall be

subject to the accrual of late fees or interest pursuant to the express provisions of the

Policies.

3.    **Lumbermens' Adjustment of Tower's Collateral.**

In consideration of the provisions of Paragraph 1 above, and as a material element of this Agreement, Lumbermens has caused and/or authorized the reduction of the Collateral by the sum of $12,879,967.00, such that the amount of the remaining Collateral has been reduced from $26,379,967.00 to $13,500,000.00.

Within seven days of satisfaction of the condition precedent set forth herein, Lumbermens shall take all necessary steps to cause and/or authorize the reduction of the Collateral by an additional $2,500,000.00, such that the amount of the remaining Collateral shall be further reduced thereby from $13,500,000.00 to $11,000,000.00.

4.    **Lumbermens' Release of Tower.**

Except as otherwise provided herein, Lumbermens fully, finally and unconditionally releases and discharges Tower from any all existing and future Tower Payment Obligations, including but not limited to premium, deferred premium, dividend redeterminations, dividend recall, audit adjustments, taxes and assessments. For the avoidance of doubt, and pursuant to the provisions of Paragraph 2 above, ***Lumbermens expressly does not release Tower from, and Tower agrees to reimburse Lumbermens for,*** all Tower Retained Losses actually paid by Lumbermens.

5.    **Tower's Release of Lumbermens.**

Tower fully, finally and unconditionally releases and discharges Lumbermens from any claims or causes of action arising out of or related to the 2004 Invoice, the 2006 Invoice, the Tower Payment Obligations (except as provided herein), the Collateral (except as provided herein), and any and all amounts previously paid to Lumbermens by

Tower or Deutsche Bank, including but not limited to those claims and causes of action that were asserted, or could have been asserted, in the Lawsuit.

For the avoidance of doubt, Tower does not release Lumbermens from, and Lumbermens shall remain financially obligated to Tower for, any and all claims or losses to which the Policies respond other than the portions thereof that constitute Tower Retained Losses.

6.     **Dismissal of the Lawsuit.**

Upon satisfaction of the condition precedent set forth in Paragraph 8 herein, Tower shall as soon as practicable cause the Lawsuit to be dismissed with prejudice and shall take steps to secure the vacatur of the corresponding injunction and/or temporary restraining order. Tower shall also contemporaneously secure the discontinuation of the arbitration. Each party shall bear its own costs and fees.

7.     **Lumbermens' Continuing Review of Collateral.**

On or about June 1, 2007, and at quarterly intervals thereafter, Lumbermens shall cause a reduction of Collateral in an amount equal to the Tower Retained Losses paid by Lumbermens and reimbursed by Tower during the preceding quarter.

On or about November 1, 2007, and at annual intervals thereafter, Lumbermens shall perform a review, pursuant to the Policies and incorporating Lumbermens' usual and customary methodology, to determine the adequacy of the Collateral at such time and shall, when warranted, promptly cause an adjustment of the Collateral. For the avoidance of doubt, Lumbermens' usual and customary methodology shall involve the use of loss development factors specified in the Policies and, if and when such contractual factors are not specified, shall incorporate Lumbermens' actuarially-derived loss development

5

factors and credit margins applicable to its insurance business generally. These annual adjustments shall at all times be further subject to the terms of the Stipulation referred to in Paragraph 8 below.

**8.    Condition Precedent.**

The entry by the Bankruptcy Court of an order approving the stipulation attached hereto as Exhibit A ("Stipulation") is an absolute condition precedent to effectiveness of, and the parties' respective rights, duties and obligations under, this Agreement. Tower shall, as soon as practicable, present the Stipulation to the Bankruptcy Court for consideration and approval, shall provide notice to Lumbermens of such action, and shall keep Lumbermens apprised of its efforts to secure approval and of and any meaningful challenges or objections thereto by the Bankruptcy Court or by any interested party.

**9.    Binding on Successors.**

The rights, duties and obligations of Lumbermens and Tower hereunder shall be binding upon and shall inure to the benefit not just of the parties but also of their respective successors, assigns, liquidators and/or receivers and, in the case of Tower, any reorganized entity.

The provisions of this Agreement specifically do not extend to any third-party claim administrator, including but not limited to Broadspire, Inc, and the rights, duties and obligations of any such third-party claim administrator remain unaffected hereby.

**10.    Representations and Warranties.**

Lumbermens and Tower each represent and warrant to the other that no authorizations, consents or approvals (other than the approval of the Bankruptcy Court) are necessary to effectuate this Agreement, that the person executing this Agreement is

empowered to do so and can bind it thereby, and that there are no existing agreements, conditions, transactions or negotiations to which it is a party that would render this Agreement, or any part thereof, void or unenforceable.

11.    **Entire Agreement / Severability.**

This Agreement constitutes the entire agreement between Lumbermens and Tower as respects its subject matter. All previous discussions and negotiations between the parties concerning the subject matter hereof are merged into this Agreement, which may not be modified or revised except by written amendment signed by both parties. If any provision of this Agreement shall be held void, illegal or unenforceable, the validity of the remaining provisions shall not be affected thereby.

12.    **Governing Law.**

The laws of the State of Illinois shall govern the terms of this Agreement.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year written below.

LUMBERMENS MUTUAL CASUALTY COMPANY

for itself and on behalf of its insurance company subsidiaries and affiliates

By: _____

Its: ASSOCIATE GENERAL COUNSEL

Date: 5/9/07

TOWER AUTOMOTIVE, INC.

for itself and on behalf of its subsidiaries and affiliates

By: _____

Its: CFO

Date: 5. 9. 07

8

# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | |
| | ) | **Chapter 11** |
| **TOWER AUTOMOTIVE, INC., et al.** | ) | **Case No. 05-10578(ALG)** |
| | ) | **Jointly Administered** |
| Debtors. | ) | |
| | ) | |
| ———————————— | ) | |
| | ) | |
| **TOWER AUTOMOTIVE, INC.** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Adv. Proc. No.06-01481** |
| | ) | |
| **LUMBERMENS MUTUAL CASUALTY** | ) | |
| **COMPANY, AMERICAN MOTORISTS** | ) | |
| **INSURANCE COMPANY, AMERICAN** | ) | |
| **MANUFACTURERS MUTUAL INSURANCE** | ) | |
| **COMPANY and AMERICAN PROTECTION** | ) | |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| Defendants. | ) | |

## STIPULATION REGARDING LETTER OF CREDIT REQUIREMENTS
## UNDER CERTAIN INSURANCE POLICIES

WHEREAS, Lumbermens Mutual Casualty Company, American Motorists Insurance Company, American Manufacturers Mutual Insurance Company and American Protection Insurance Company (collectively "Lumbermens") and Tower Automotive, Inc. ("Tower") have entered into various written proposals for and contracts of insurance (collectively the "Policies") pursuant to which Lumbermens purported to provide workers compensation, general liability and automobile liability insurance protection and insurance-related services to Tower; and

WHEREAS, Tower is obligated under the Policies to reimburse or otherwise fund a certain portion of each claim or loss (including indemnity and allocated claim expense)

to which the Policies respond, some of which losses are characterized as "deductible" losses and some of which are characterized as "insured" losses subject to a dividend plan (collectively the "Tower Retained Losses");  and

WHEREAS, in connection with the Policies, Tower procured from Deutsche Bank, and had Lumbermens identified as the beneficiary on, an unconditional evergreen letter of credit (the "Collateral") securing the Tower Retained Losses and other obligations of Tower to Lumbermens;  and

WHEREAS, in connection with the resolution of a dispute between the parties, Lumbermens (a) authorized a reduction of the Collateral, and (b) agreed to authorize a further reduction and consented to a future course of dealing as respects the Collateral only upon the entry of an order approving the instant stipulation.

NOW THEREFORE, Tower and Lumbermens stipulate and agree as follows:

1. Within seven days of the entry of a final order approving this Stipulation, Lumbermens shall take all necessary steps to cause and/or authorize the reduction of the Collateral by an additional $2,500,000.00, such that the amount of the remaining Collateral shall be reduced from $13,500,000.000 to $11,000,000.00.

2. On or about June 1, 2007, and at quarterly intervals thereafter, Lumbermens shall cause and/or authorize a reduction of Collateral in an amount equal to the Tower Retained Losses actually paid by Lumbermens and reimbursed by Tower during the preceding quarter.

3. On or about November 1, 2007, and at annual intervals thereafter (each an "Annual Redetermination"), Lumbermens shall perform a review, pursuant to the Policies and incorporating Lumbermens' usual and customary methodology, to

determine the adequacy of the Collateral at such time and shall, when warranted, promptly cause and/or authorize an adjustment to the Collateral subject to the terms of this Stipulation. For the avoidance of doubt, Lumbermens' usual and customary methodology shall involve the use of loss development factors specified in the Policies and, if and when such contractual factors are not specified, shall incorporate Lumbermens' actuarially-derived loss development factors and credit margins applicable to its insurance business generally.

4.     Tower shall, as of each Annual Redetermination, be obligated to provide Lumbermens with (and Lumbermens shall be entitled to maintain) Collateral in an amount no less than 115% of the then-existing amount of unpaid Tower Retained Losses. In the event of an increase in the unpaid Tower Retained Losses such that the amount of Collateral at the time of any Annual Redetermination is less than 115% of the amount of the unpaid Tower Retained Losses, Tower is authorized to, and shall, obtain (through its post-petition financing facility) additional Collateral.

5.     Lumbermens shall invoice Tower on a monthly basis for reimbursement of all Tower Retained Losses actually paid by Lumbermens during the previous monthly period. Tower is authorized and directed to continue to pay and/or timely reimburse Lumbermens for such invoices.

6.     The relief granted herein and the rights of Lumbermens pursuant to this stipulation shall not be altered, modified, extended, impaired or affected by any plan or reorganization ("Plan") filed by Tower, except that the rights and

obligations of Tower hereunder shall be assumed pursuant to such Plan by "Reorganized Tower" or any successor to Tower pursuant to such Plan.

7.      In the event Tower is unable to satisfy its obligations under paragraph 4 herein in the event such obligations are triggered, Lumbermens shall have an administrative expense claim in an amount equal to 115% of the then-existing unpaid Tower Retained Losses less the then-existing amount of the Collateral.

8.      In the event "Reorganized Tower" or Tower's successor does not assume this Stipulation as contemplated in paragraph 6 herein, Lumbermens shall have an administrative expense claim equal to 130% of the then-existing unpaid Tower Retained Losses less the then-existing amount of the Collateral.

9.      Except as set forth herein, nothing in this Stipulation or any accompanying motion or order shall (a) be construed as a request for authority to assume an executory contract, (b) waive, affect or impair any of Lumbermens' rights, claims or defenses, (c) grant third-party beneficiary status or bestow any additional rights on any third party, or (d) otherwise be enforceable by any other party.

10.     The Bankruptcy Court shall retain jurisdiction to hear any matters or disputes arising from or relating to this Stipulation.

11.     This Stipulation shall not be binding and is not effective unless and until approved by an order of the Bankruptcy Court.

Dated:         May _7_, 2007


[REMAINDER OF PAGE LEFT BLANK]

MAY-09-2007  09:13PM  FROM-TOWER AUTOMOTIVE NOVI          +12486756492          T-569  P.003/003  F-881

LUMBERMENS MUTUAL CASUALTY COMPANY
AMERICAN MOTORISTS INSURANCE COMPANY
AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY
AMERICAN PROTECTION INSURANCE COMPANY

By: _____

Name: _____JOHN M. McGREGOR_____

Its: _____ASSOCIATE GENERAL COUNSEL____


TOWER AUTOMOTIVE, INC.

By: _____

Name: ____James Mallak_____

Its: ____CFO_____

# EXHIBIT C

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| TOWER AUTOMOTIVE, INC., et al., | ) | Case No. 05-10578 (ALG) |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) |  |

**ORDER PURSUANT TO RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, APPROVING THE SETTLEMENT AGREEMENT AND STIPULATION BY AND BETWEEN THE DEBTORS AND LUMBERMENS MUTUAL CASUALTY COMPANY**

Upon the motion, dated May 11, 2007 (the "Motion")[1] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for an order pursuant to rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") approving the Settlement Agreement and Stipulation by and between the Debtors and Lumbermens Mutual Casualty Company ("Kemper"), and it appearing that this Court has jurisdiction to consider and determine the Motion as a core proceeding pursuant to 28 U.S.C. §§ 157 and 1334; and due and proper notice of the Motion having been given; and the Court having reviewed the Motion and having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it further appearing that the relief requested in the Motion is within the Debtors' sound business judgment; and it further appearing that the Stipulation and Settlement Agreement are fair, reasonable and in the best interests of the Debtors, their estates, creditors and other parties in interest; and the Court having determined that the Settlement

---

[1]  Capitalized terms not otherwise defined herein shall have the meaning ascribed thereto in the Motion.

K&E 11590431.2

Agreement and Stipulation were entered into in good faith and are a result of arms-length negotiations; and after due deliberation and sufficient cause appearing therefor, it is hereby:

ORDERED that the Motion be, and hereby is, granted; and it is further

ORDERED that the Settlement Agreement and Stipulation are authorized and approved pursuant to Bankruptcy Rule 9019; and it is further

ORDERED that the Debtors are authorized to execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers and to take any and all actions reasonably necessary or appropriate to consummate the Settlement Agreement and perform any and all obligations contemplated therein; and it is further

ORDERED that the requirement under rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York for the filing of a separate memorandum of law has been satisfied or is otherwise waived; and it is further

ORDERED that this Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated:  New York, New York
        June 5, 2007

                            _/s/ Allan L. Gropper_____
                            Hon. Allan L. Gropper
                            United States Bankruptcy Judge

# EXHIBIT D



27275 Haggerty Road

Suite 680

Novi, MI 48377

January 22, 2008            **Via Email**

Dear Mr. McGregor:

     I am writing on behalf of Tower Automotive, LLC to protest Lumbermans Mutual Casualty Company's imposition of a 35% credit surcharge to the November 2007 annual collateral re-determination made pursuant to the parties' May 9, 2007 Settlement Agreement. As you know, that Settlement Agreement only allows Lumbermans to utilize "credit margins applicable to its insurance business generally." (May 9, 2007 Settlement Agreement, at Section 7)  Given the fact that this book of business has been in run-off for almost five years (the last policy expiring in April 2003) and that the claims reserves are therefore very well established, the imposition of a 35% credit surcharge is unprecedented in the industry and is totally inconsistent with the letter and spirit of the Settlement Agreement.

     Tower Automotive requests that Lumbermans produce within 30 days documentation supporting its apparent contention that this credit surcharge is being applied "to its insurance business generally." Such documentation should include, but not be limited to, a list of all workers compensation policyholders to whom such a 35% credit surcharge is being applied, a list of all workers compensation policyholders who are being charged a lower credit surcharge (or no surcharge) with an explanation for that discrepancy, and a written actuarial analysis setting forth the methods used to calculate the 35% credit surcharge and its actuarial justification(s), if any. After receiving this documentation, Tower Automotive reserves the right to conduct an on-site audit of Lumbermans' files relating to this credit surcharge.

     Please call our counsel Andrew Running at Kirkland & Ellis LLP in Chicago (312-861-2412) if you have any questions regarding this request.

Sincerely,

Jim Commet,
Workers' Compensation Manager

CC:
David DiRita, Tower Automotive, LLC. Corporate Counsel
Andrew Running, Kirkland & Ellis LLP

# EXHIBIT E

**Commet James**

| | |
|---|---|
| From: | Commet James |
| Sent: | Tuesday, February 12, 2008 7:20 AM |
| To: | Pike Dennis |
| Subject: | FW: Kemper Collateral Review |

```
         "Jack
         McGregor"
         <jack.mcg                        To
         regor@kem        "Commet James"
         perinsura        <Commet.James@towerauto
         nce.com>         motive.com>
                                          cc
         02/11/200        "Andrew Running"
         8 04:02          <arunning@kirkland.com>
         PM                          Subject
                          Kemper Collateral
                          Review
```

Jim, I want to apologize for the delay in responding to your objection to Kemper's collateral calculation methodology as respects the Tower account. We've had our hands full with deals and year-end accounting issues.

I think you're generally aware of how our process works, but I'll walk you through it from soup to nuts in the interest of full disclosure.

We begin by looking at actual unpaid losses, based on current case reserve levels and limiting each claim at the per-claim retention. We then multiply the unpaid limited retained losses by loss conversion factors to account for both (i) adverse development on the open claims, and (ii) the "true IBNR," or the potential for new or reopened claims. These loss conversion factors are sometimes expressly provided for in the insurance agreements, but when they are not, we resort to actuarially-derived factors based on Kemper's historical experience on the relevant lines of business.

The above calculation yields a straight-up "collateral need," or the estimated amount of collateral we feel we need to hold to secure the ultimate retained losses.
To this, we add a margin ranging from 15% to 75% -- to account for the fact that half the time our calculations will be deficient and half the time they will be conservative, and to make sure that we're erring on the side of eliminating the deficiencies.

The varying margins are the product of both the policyholder's financial / credit risk and the seasoning of the losses, such that an older account with A rated credit will receive a 15% margin and a more recent account in Chapter 11 will get a 75% margin. Most accounts written primarily in the last seven to ten years fall within the 25% to 35% margin range, depending largely on the insured's financials.

1

Tower's 35% is what we would have assigned any similarly-situated policyholder, and it will decrease with the passage of time. Also, if I recall correctly, one or more of the program agreements called for the use of loss development factors higher than the Kemper-derived factors we have opted to use, which should have softened some of the blow.

I know Tower is not happy with our methodology but I want you to at least know where it comes from and that Tower is not being adversely impacted vis-à-vis our collateral portfolio at large. Please let me know if you have any follow-up questions, and regrets again about the tardy response.

Best regards,

Jack McGregor
Associate General Counsel
Kemper Insurance Companies
(847) 320-2774
jack.mcgregor@kemperinsurance.com


**********************************************************

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for

the use of the addressee.  It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful.  If you have received this communication in error, please notify us immediately by

return e-mail or by e-mail to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.
**********************************************************


**********************************************************
The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee.  It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful.  If you have received this communication in error, please notify us immediately by return e-mail or by e-mail to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.
**********************************************************

# EXHIBIT F

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

Andrew R. Running
To Call Writer Directly:
312 861-2412
arunning@kirkland.com

(312) 861-2000

www.kirkland.com

Facsimile:
(312) 861-2200

February 14, 2008

## VIA E-MAIL & U.S. MAIL

John M. McGregor
Associate General Counsel
Kemper Insurance Companies
One Kemper Drive
Long Grove, IL 60049-0001

Re:    *In re Tower Automotive, Inc.*, Case No. 05-10578 (ALG), U.S. Bankruptcy
Court for the Southern District of New York; May 9, 2007 Settlement Agreement
between Debtors and Lumbermans Mutual Casualty Company.

Dear Mr. McGregor:

As you know, Tower's Workers Compensation Manager, James Commet, sent you an e-mail on January 22, 2008 protesting Lumbermans' imposition of a 35% "credit surcharge" on its November 1, 2007 annual collateral determination, and requested that Lumbermans provide specific documentary and actuarial support for that high surcharge. Lumbermans' collateral determination is governed by Judge Gropper's Order approving the parties' May 9, 2007 Settlement Agreement, which provides in relevant part that Lumbermans may only use "actuarially derived loss development factors and credit margins applicable to its insurance business generally." (Settlement Agreement § 7) In other words, to comply with that Order, Lumbermans must be able to demonstrate that the surcharge is "actuarially derived" and is fairly applied to all of Lumbermans' policyholders. Tower protested the imposition of a 35% credit surcharge because there is, to our knowledge, no industry precedent or actuarial basis for imposing such a high credit surcharge, particularly on a mature book of claims with stable, well-established claims reserves.

Your February 11, 2008 response to Mr. Commet only reinforces our objections to this surcharge. First, while you professed to be acting "in the interest of full disclosure," you provided no actuarial analysis whatsoever to support the 35% credit surcharge. After explaining the "process" for determining case reserves and IBNR reserves (neither of which Tower is challenging), you provided the following cursory, three-sentence explanation for the 35% surcharge applied to Tower:

Hong Kong        London        Los Angeles        Munich        New York        San Francisco        Washington, D.C.

## KIRKLAND & ELLIS LLP

John M. McGregor
February 14, 2008
Page 2

> [W]e add a margin ranging from 15% to 75% -- to account for the fact that half the time our calculations will be deficient and half the time they will be conservative, and to make sure that we're erring on the side of eliminating the deficiencies. The varying margins are the product of both the policyholder's financial / credit risk and the seasoning of the losses, such that an older account with A rated credit will receive a 15% margin and a more recent account in Chapter 11 will get a 75% margin. Most accounts written primarily in the last seven to ten years fall within the 25% to 35% margin range, depending largely on the insured's financials.

This explanation raises more questions than it answers, including:

- What actuarial analysis do you have to support your assertion that Lumbermans' case reserves and IBNR calculations for Tower will be "deficient . . . half the time"? Tower's assessment is that Lumbermans' case reserves and IBNR calculations for Tower's workers compensation policies are already very conservative. While we have not disputed those reserves, we believe it is disingenuous for Lumbermans to unilaterally set conservative reserves and then assert they are for unexplained reasons likely to be "deficient."

- Why isn't Lumbermans willing to disclose specifically how it arrived at the 35% credit surcharge for Tower? You merely assert that this surcharge is "the product of both the policyholder's financial / credit risk and the seasoning of the losses," without providing any description of how those two factors were assessed and quantified or how their "product" was calculated (assuming any calculation was done). Your failure to provide any supporting analysis leads us to conclude that, in reality, there is no analysis supporting this 35% surcharge.

- As you know, Mr. Commet made a specific request for documentary evidence to show that Lumbermans is complying with the requirement of the Settlement Agreement that Tower's credit margin be no higher than "credit margins applicable to [Lumbermans'] insurance business generally." In response, you merely assert that "[m]ost accounts written primarily in the last seven to ten years fall within the 25% to 35% margin range, depending largely on the insured's financials." We renew our demand for documentary support for this assertion.

## KIRKLAND & ELLIS LLP

John M. McGregor
February 14, 2008
Page 3

        We once again refer you to the specific document requests in Mr. Commet's January 22, 2007 e-mail (a copy of which is attached hereto), and ask that you comply with them by the February 22nd deadline set forth in his letter. If you are willing to comply with these requests, but need additional time to do so, please call me to discuss that. But otherwise, if we do not receive a satisfactory response from you by February 22nd, we will have no alternative but to seek judicial enforcement of the Settlement Agreement from the Bankruptcy Court, which retains jurisdiction over this matter.

                                        Sincerely,

                                        Andrew R. Running

ARR/pad
Enclosure